Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued  February  26,  2004        Decided  July  23,  2004

No. 02-1294

HONEYWELL INTERNATIONAL, INC.,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

ATOFINA CHEMICALS, INC.,
INTERVENOR

On Petition for Review of an Order of the
Environmental Protection Agency

*Angus Macbeth* argued the cause for petitioner. With him on the briefs were *Timothy K. Webster* and *Richard E. Ayres*. *Barry S. Neuman* entered an appearance.

*Thomas A. Lorenzen*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

were *Steven Edward Rusak*, Attorney, *Lisa M. Jaeger*, Acting General Counsel, U.S. Environmental Protection Agency, and *Jan M. Tierney*, Attorney.

*Sheila A. Millar* argued the cause for intervenor ATOFINA Chemicals, Inc. With her on the brief were *Peter L. de la Cruz* and *Jean-Cyril Walker*.

Before: Sentelle, Randolph and Rogers, *Circuit Judges*.

Opinion for the Court filed *Per Curiam*.

Concurring opinion filed by *Circuit Judge* Randolph, with whom *Circuit Judge* Sentelle joins.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* Rogers.

*Per Curiam*: The opinion of the court is presented in two parts. In the first part, Judge Rogers writes for a unanimous court to introduce the issues presented and to hold that Honeywell International, Inc. has standing to challenge the rule on review promulgated by the Environmental Protection Agency ("EPA"). In the second part, Judge Sentelle writes for himself and Judge Randolph on Honeywell's challenge to EPA's reliance on economic considerations in promulgating the rule on review, concluding that the rule must be vacated; Judge Randolph writes on the remedy; and Judge Rogers concurs in part and dissents in part, and would remand the rule to EPA for further explanation.

## PART I

Rogers, *Circuit Judge*, writing in PART I the opinion of the court: Title VI of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7671–7671q (2004), implements the policies and directives of the Montreal Protocol on Substances that Deplete the Ozone Layer, Sept. 16, 1987, 26 I.L.M. 1550 (entered into force Jan. 1, 1989), in two ways relevant to this appeal: first, by setting timetables for phasing out production and importation of chemicals that deplete the protective stratospheric

ozone layer, such as chlorofluorocarbons ("CFCs") and hydro-chlorofluorocarbons ("HCFCs"), and second, by identifying substitutes for ozone-depleting substances thus phased out. Among the industrial uses of CFCs and HCFCs is the manufacture of foam products. In 1999 the Environmental Protection Agency ("EPA") designated HFC–245fa, a non-ozone depleting hydrofluorocarbon ("HFC") product developed by Honeywell International, Inc. ("Honeywell"), as an acceptable listed substitute for HCFC–141b, an ozone-depleting chemical scheduled to be phased out in 2003, for all foam uses. Honeywell now challenges a final rule also authorizing as substitutes for HCFC–141b the use of two ozone-depleting chemicals — HCFC–22 and HCFC–142b — in certain foam end-uses if technical constraints prevent use of an approved listed alternative. Honeywell contends that EPA exceeded its statutory authority and departed from its policy without rational explanation by approving ozone-depleting chemicals because EPA (1) failed to provide adequate notice of its decision to approve HCFC–22 and HCFC–142b where its rule had proposed the opposite; (2) had previously approved substitutes that, in relative terms, present a reduced risk to human health and the environment; and (3) improperly considered potential economic impact when rendering its final decision. EPA responds, as a threshold matter, that Honeywell lacks standing, and on the merits, that there was adequate notice, and that Honeywell misconstrues the effect of the listing of an approved substitute chemical and ignores that continued use of ozone-depleting chemicals under the rule turns only on technical feasibility and not costs. On reply, Honeywell also contends that the rule impermissibly delegates certain determinations to the regulated end users. We hold that Honeywell has standing.

## I.

Title VI of the Clean Air Act, 42 U.S.C. §§ 7671–7671q, sets restrictions on the use of chemicals known to have ozone-

depleting properties as part of the implementation of a set of policies aimed at protecting the ozone layer. Sections 604 and 605 of the CAA, *id.* §§ 7671c & 7671d, set timetables phasing out, over time, most uses of "Class I" substances (which include chlorofluorocarbons) and "Class II substances" (which include hydrochlorofluorocarbons). As many such chemicals had been put to use in a wide array of commercial applications, the CAA seeks to ensure the availability of ozone-friendly replacements through § 612, *id.* § 7671k, which establishes the "safe alternatives policy." Section 612(a) provides that, "[t]o the maximum extent practicable, class I and class II substances shall be replaced by chemicals, product substitutes, or alternative manufacturing processes that reduce overall risks to human health and the environment." The Administrator of EPA is directed to take several steps to promote this transition, such as recommending research efforts to identify and develop alternatives for Class I and Class II substances. *See* CAA § 612(b).

As relevant to Honeywell's petition for review, the Administrator must also "promulgate rules . . . providing that it shall be unlawful to replace any class I or class II substance with any substitute substance which the Administrator determines may present adverse effects to human health or the environment, where the Administrator has identified an alternative to such replacement that — (1) reduces the overall risk to human health and the environment; and (2) is currently or potentially available." CAA § 612(c). The Administrator is required to publish lists of substitute chemicals that are prohibited or permitted for specific uses. *Id.* EPA has implemented CAA § 612 through the Significant New Alternatives Program ("SNAP"), 40 C.F.R. §§ 82.170–82.184 (2004), which establishes criteria and procedures for listing chemicals as approved substitutes for chemicals phased out pursuant to the CAA. Under the SNAP program, substitutes can be listed as "acceptable" or "unacceptable," but the regulations also contemplate that substitutes may be listed as acceptable subject to "use conditions" (in which use of the substitute is permitted if certain procedures to minimize environmental and human risk are followed) or "use limits"

(in which use of the substitute is permitted for a "narrowed range of use . . . because of the lack of alternatives for specialized applications"). *See id.* § 82.180(b).

In 1993, EPA, acting pursuant to CAA § 606, 42 U.S.C. § 7671e, which authorizes the acceleration of statutory phaseout dates, promulgated bans on the importation and production of three Class II chemicals relevant to this petition: HCFC–141b, HCFC–22, and HCFC–142b. 58 Fed Reg. 65,018, 65,028 (Dec. 10, 1993). The ban is effective in 2003 for HCFC–141b, and in 2010 for HCFC–22 and HFCF–142b. *Id*. However, in 1994, EPA also approved these three hydrochlorofluorocarbons, in the interim, as alternatives, in foam uses, to more ozone-damaging chlorofluorocarbons phased out pursuant to CAA Title VI. *See* 59 Fed. Reg. 13,044, 13,083 (March 18, 1994). In anticipation of the 2003 ban on the importation and manufacture of HCFC–141b, Honeywell developed a non-ozone-depleting hydrofluorocarbon, HFC–245fa, to function as a substitute for HCFC–141b in foam applications. In 1999, EPA approved Honeywell's petition to list HCFC–245fa as an acceptable substitute for HCFC–141b in all foam end uses. *See* 64 Fed. Reg. 68,039, 68,041 (Dec. 6, 1999).

The final rule followed upon intervenor ATOFINA Chemicals, Inc.'s petition of February 17, 1999, requesting that HCFC–22 and HCFC–142b, along with a third chemical, HCFC–124, also be approved as acceptable substitutes for HCFC–141b in foam applications. 65 Fed. Reg. 42,653, 42,656 (July 11, 2000). HCFC–22 and HCFC–142b were already in use in several foam applications, due to EPA's 1994 approval of those chemicals as CFC substitutes, 59 Fed. Reg. at 13,083, and ATOFINA's petition, if granted, would have permitted their use as substitutes for HCFC–141b as well. EPA issued a notice of proposed rulemaking, in which it proposed to revisit the status of HCFC–141b, HCFC–22, HCFC–124, and HCFC–142b, and to list all four as unacceptable in all foam applications, both as substitutes for CFCs and for each other. 65 Fed. Reg. at 42,656. The proposed rule, *inter alia*, had the effect of denying ATOFINA's petition to allow new users to use HCFC–22, HCFC–124 and HCFC–

142b as substitutes for HCFC–141b, but also swept more broadly by effectively proposing to disallow all existing use of the four hydrochlorofluorocarbons. EPA explained that it was proposing to list the chemicals as unacceptable because they had significant ozone-depleting potential and "there are technically feasible zero-ODP [ozone-depleting-potential] substitutes available." *Id.* at 42,657–58.

EPA received numerous comments on the proposed rule, many of which focused on the economic impact, particularly to small businesses, of comprehensively de-listing the four chemicals at issue; the bulk of these related to the economic hardship that existing users of HCFC–22 and HCFC–142b would face from the proposed ban. After the comment period closed, EPA obtained additional information through new comments, meetings with industry representatives, and a consultant it hired to gather additional information on the feasibility of alternatives to HCFC–141b in certain sectors. EPA's consultant's report in particular expressed doubts about the ability of existing approved alternatives to HCFC–141b to function as viable substitutes across all specific foam end-uses, for economic reasons, such as the cost of HFC–245fa and the cost of equipment adjustments, and for technical reasons, such as the inability of foams manufactured with approved alternatives, at least those that had been tested, to meet certain insulation and space requirements. EPA then published a notice of data availability inviting comment, noting that the new information pertained to, *inter alia*, "alternatives currently used in each sector and technically viable alternatives." 66 Fed. Reg. 28,408, 28,408 (May 23, 2001).

After receiving additional comment, EPA issued a final rule implementing its proposed rule in some respects but not others. 67 Fed. Reg. 47,703 (July 22, 2002). First, EPA deferred reaching a decision on whether it would permit continued use of HCFC–141b. *Id.* at 47,706. Second, EPA abandoned its proposal to limit existing use of HCFC–22 and HCFC–142b as substitutes for CFCs, and allowed existing users of those chemicals *continued* use of them, noting that "there would be a significant impact on small businesses" if EPA proceeded as proposed and that switching to alterna-

tives "would be difficult and prohibitively costly." *Id*. at 47,706–09. Third, EPA implemented its proposal to list HCFC–124 as unacceptable in all foam uses, thus denying ATOFINA's petition in that respect. *Id*. at 47,708. Fourth, as to ATOFINA's petition to allow *new* use of HCFC–22 and HCFC–142b, as substitutes for HCFC–141b, EPA established different rules for their use based on the specific application. Observing that it "is strongly opposed to listing HCFCs as acceptable where non-ozone-depleting alternatives are available," EPA listed HCFC–22 and HCFC–142b as unacceptable substitutes for HCFC–141b in several end-uses (polyurethane boardstock, spray foam, and appliances) because manufacturers in those sectors had "identified and, in many cases, implemented viable non-ozone-depleting alternatives to HCFC–141b." *Id*. at 47,707. For uses in commercial refrigeration, sandwich panel applications, polyurethane slabstock, and other foams, however, which EPA noted were "comprised of a wide range of diverse applications with unique technical considerations," EPA stated that for these three uses "ozone-friendly alternatives to HCFC–141b have not yet been fully developed and implemented across the spectrum of applications." *Id.* Because "technical information is scarce for these applications" and it is "difficult to assess, in the absence of detailed information, the viability of alternatives in each narrow application," EPA expressed concern that some end-users in specific applications might not be able to switch to approved alternatives because of thermal performance, dimensional, and flammability control requirements. *Id*. at 47,713–14. In the final rule, EPA, pursuant to 40 C.F.R. § 82.180(b)(3), listed HCFC–22 and HCFC–142b as acceptable substitutes for HCFC–141b within those three end-uses, subject to narrowed use limits conditioned on the user's ability first to "ascertain that other acceptable alternatives are not technically feasible." *Id.* at 47,705. Users would be required to "document the results of their evaluation, and retain the results on file for the purpose of demonstrating compliance." *Id.* Notwithstanding its decision to allow some substitution of HCFC–22 and HCFC–142b for HCFC–141b, EPA advised that it was "continuing to review" the end-uses

in question "to determine the progress of non-ozone-depleting alternatives," and that "[a]s non-ozone-depleting alternatives become more widely available, the agency will reevaluate the acceptability of HCFCs in these end-uses." *Id.* at 47,707. The rule also advised end-users to begin using non-ozone-depleting substitutes as they became available "in anticipation of future EPA action restricting the use of HCFCs." *Id.*

Anticipating based on its own market analysis that it will lose sales volume for HFC–245fa if some users are permitted to substitute HCFC–22 and HCFC–142b for HCFC–141b, Honeywell filed this petition for review. *See* CAA § 307, 42 U.S.C. § 7607. Honeywell, which also manufactures HCFC–22 and sells stockpiles of HCFC–141b and HCFC–142b, does not challenge EPA's decisions to defer a decision regarding the permissibility of HCFC–141b use, to allow *continued* use of HCFC–22 and HCFC–142b as CFC substitutes, and to bar use of HCFC–124. Rather, Honeywell's petition is limited to EPA's fourth decision, to permit some *new* use of HCFC–22 and HCFC–142b, as substitutes for HCFC–141b.

## II.

As a threshold matter, we address EPA's contention that Honeywell lacks standing under Article III of the Constitution as well as prudential standing to challenge the final rule. EPA sees this lawsuit as "nothing more than a futile effort to bolster the demands for [Honeywell's] product, HFC–245fa, in a market that cannot use the product because of technical constraints." Resp. Br. at 3. For Article III standing, Honeywell points to its "substantial economic injury — lost sales of HCFC 245fa." Pet. Br. at 13. For prudential standing, Honeywell points to "its role in the market for substitutes to ozone-depleting substance that Congress created in Section 612 of the CAA." *Id.* at 14. Essentially, we agree that Honeywell has standing to challenge the final rule for these reasons.

**A.**

A party wishing to challenge agency action must meet the familiar Article III requirements of injury in fact, traceability, and redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1147 (D.C. Cir. 2002). The final rule authorizes the use of HCFC–22 and HCFC–142b as substitutes for HCFC–141b only pursuant to narrowed use limits, conditioned upon the user's ability first to ascertain and document that non-ozone-depleting alternatives, such as HFC–245fa, are not technically feasible for the specific application of HCFC–22 and HCFC–142b. EPA contends, therefore, that Honeywell suffers no "injury in fact" from having those chemicals listed as acceptable because the rule permits their use only by parties who are not potential purchasers of Honeywell's product.

While the narrowed use limits may very well cause Honeywell's injury to be smaller than it would have been if the EPA had approved ATOFINA's petition outright, they defeat standing only if the court can conclude that there are no additional foam manufacturers that would purchase HFC–245fa if HCFC–22 and HCFC–142b were unavailable. This assumption is not justified on the rulemaking record. The final rule, 40 C.F.R. Pt. 82, Subpt. G, App. K (table) (2004), requires only documentation that alternative chemicals would not satisfy existing "performance or safety requirements," not documentation that it would be impossible to manufacture foam at all. Presumably some manufacturers would be forced, in the absence of other alternatives, to relax their performance standards and use HCFC–245fa. Honeywell has submitted an affidavit from the Vice President and General Manager of its Chemicals Operating Unit, Richard V. Preziotti, stating that Honeywell performed a market analysis in 1999 estimating domestic demand for HFC–245fa of approximately 20 million pounds over the period 2003–2010 for use in commercial refrigeration and sandwich panel applications, rigid polyurethane slabstock, and "other foams" categories, assuming users of HCFC–141b would not be permitted

to use other HCFCs after December 31, 2002 when production of HCFC–141b was phased out. According to the affidavit, projected losses from the final rule are approximately 2–3 million pounds per year until the phase out of HCFC–22 and HCFC–142b in 2010, for a total loss of approximately 16–24 million pounds. EPA has submitted nothing other than its own speculation to counter this evidence. *Cf. Sierra Club v. EPA*, 292 F.3d 895, 899–901 (D.C. Cir. 2002). Some subset of manufacturers that cannot meet existing performance requirements without HCFC–22 or HCFC–142b would presumably, if those chemicals were unavailable, be forced to manufacture foam products that are less commercially desirable by using available alternatives, such as Honeywell's product, and in the absence of any evidence to the contrary, the affidavit suffices to establish injury in fact. *See id.* at 400–01.

Similarly unpersuasive, for the same reason, is EPA's speculation that Honeywell might suffer no injury from the rule even if it could lead to the use of HCFC–22 or HCFC–142b by customers who might otherwise purchase HFC–245fa, either because customers might all choose different approved alternatives, because customers permitted to use HCFC–22 and HCFC–142 might nonetheless opt to purchase HFC–245fa, or because Honeywell might sell enough additional HCFC–22 and HCFC–142b, both of which it also manufactures, to compensate for any lost HFC–245fa sales. The Preziotti affidavit speaks directly to this question, stating that Honeywell's projected revenues from increased sales of HCFC–122 and HCFC–142b, neither of which is proprietary, would not offset HFC–245fa revenues lost as a result of the rule. EPA offers no evidence to the contrary. While EPA points to Honeywell's comments during the rulemaking that HFC–245fa is less expensive than HCFC–142b or HCFC–22, those figures refer to overall system cost, not the cost of HFC–245fa to foam manufacturers; EPA's consultant's report indicates the cost of HFC–245fa is meaningfully higher than the cost of competing chemicals.

Honeywell satisfies the traceability requirement because the rule legalizes the entry of a product into a market in which Honeywell competes — the market for approved substitutes for HCFC–141b. EPA maintains that Honeywell cannot demonstrate that it would benefit from a decision listing HCFC–22 and HCFC–142b as unacceptable because doing so would require speculation about the purchasing decisions of third parties not before the court. There is not much to this chain-of-speculation objection; it is well established that "[p]arties suffer cognizable injury under Article III when an agency 'lift[s] regulatory restrictions on their competitors or otherwise allow[s] increased competition.' " *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105, 1113 (D.C. Cir. 2001) (quoting *Associated Gas Distribs. v. FERC*, 899 F.2d 1250, 1259 (D.C. Cir. 1990)); *see also Bristol–Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1499 (D.C. Cir. 1996). As a favorable opinion of the court could remove the competing chemicals from the market, redressability is satisfied as well; as discussed, removal of these competing products, even if customers using them might have to relax some performance standards to use HFC–245fa, still stands to benefit Honeywell.

**B.**

In addition to the constitutional requirements of Article III, a petitioner seeking review of agency action must also demonstrate prudential standing to bring the suit; in other words, that "the interest it seeks to protect 'is arguably within the zone of interests to be protected or regulated by the statute . . . in question.' " *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 870 (D.C. Cir. 2001) (per curiam) ("Cement Kiln") (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970)). The zone of interests test "is not meant to be especially demanding," excluding only those whose interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). Our cases have pointed out that a party need not share

Congress' motives in enacting a statute to be a suitable challenger to enforce it; "parties motivated by commercial interests routinely satisfy the zone of interests test," as "[c]ongruence of interests, rather than identity of interests, is the benchmark." *Amgen, Inc. v. Smith*, 357 F.3d 103, 108–09 (D.C. Cir. 2004). If there is reason to believe that a party's interest in statutory enforcement will advance, rather than hinder, the operation of a statute, the court can reasonably assume that Congress intended to permit the suit.

EPA protests that Honeywell's interest in enforcing CAA § 612 "is nothing more than a concern [about] EPA's alleged regulatory laxity," Resp. Br. at 20, and relies on cases holding that commercial interests lack prudential standing to enforce regulatory burdens against competitors, for when those interests and those of the statute are not aligned, such suits "[c]arr[y] a considerable potential for judicial intervention that would distort the regulatory process." *Hazardous Waste Treatment Council, Inc. v. EPA*, 861 F.2d 277, 282–86 (D.C. Cir. 1988) (per curiam) ("HWTC II"); *see also Hazardous Waste Treatment Council v. EPA,* 885 F.2d 918, 924–26 (D.C. Cir. 1989) ("HWTC IV")*; Cement Kiln*, 255 F.3d at 870–71. In *HWTC II & IV* and *Cement Kiln*, the court held that manufacturers of pollution control equipment lacked prudential standing to challenge allegedly too-weak pollution regulations, where stronger regulations would lead to increased demand for their products, because of insufficient alignment between the manufacturers' commercial interests and the environmental purposes of the statute. EPA's reliance on these cases is misplaced, and EPA overreads them, for prudential standing depends on the nature of the statutory scheme and the competitor interests. Honeywell is suing to enforce a restriction, CAA § 612(c), that is hardly vulnerable to the sort of manipulation that concerned the court in the cases on which EPA relies. A substitute product is either permitted to compete in the market for approved substitutes or it is not. Irrespective of whether the statutory scheme contemplates that competitive interests will advance statutory goals, the court has held that the *Hazardous Waste Treatment Council* line of cases is inapposite when a competitor

sues to enforce a "statutory demarcation," such as an entry restriction, because "the potentially limitless incentives of competitors [are] channeled by the terms of the statute into suits of a limited nature brought to enforce the statutory demarcation." *Scheduled Airline Traffic Offices v. Dep't of Defense*, 87 F.3d 1356, 1360–61 (D.C. Cir. 1996) (quoting *First Nat'l Bank and Trust Co. v. Nat'l Credit Union Admin.*, 988 F.2d 1272, 1278 (D.C. Cir. 1993), *aff'd* 522 U.S. 479 (1998)). A suit by a competitor to enforce § 612(c) involves such a demarcation; "entry-like restrictions" are less subject to manipulation than the open-ended emissions standards in *HWTC II & IV* and *Cement Kiln* because they "constrain[ ] competitors to a limited role in guarding a congressionally drawn boundary." *First Nat'l Bank and Trust Co.*, 988 F.2d at 1278. Therefore, the limits of CAA § 612, which restricts challenges to a determination of whether EPA properly decided which substances should be allowed to compete in the market for approved substitutes, sufficiently align Honeywell's competitive interests with those of the statute to make it a suitable challenger to enforce CAA 612's terms.

## **PART II**

SENTELLE, *Circuit Judge*, writing in Part II the opinion of the court: Honeywell brings this petition for review arguing that EPA exceeded its statutory authority under Clean Air Act ("CAA") section 612(c) by approving HCFC–22 and HCFC–142b as acceptable substitutes for HCFC–141b in certain limited end uses, and therefore allowing those two chemicals to compete with Honeywell's approved substitute, HFC–245fa. The argument is that EPA premised its approval on the economic impact of denying ATOFINA's petition (which would have limited the market for substitutes to HFC–245fa). Because section 612(c), Honeywell claims, does not permit EPA to consider economic factors in the approval process, this approval exceeded EPA's statutory authority under the CAA.

We agree that EPA's rule considered economic factors and grant Honeywell's petition for review. We also hold that the

only permissible remedy under the CAA is to vacate the rule. We therefore vacate the rule to the extent it approves ATOFINA's application to list new uses of HCFC–22 and HCFC–142b as acceptable substitutes for HCFC–141b in certain limited end uses.

**I.**

HCFC–141b is a blowing agent used to manufacture certain types of foam, primarily foam insulation. The rule under review listed new uses of HCFC–22 and HCFC–142b as acceptable substitutes for HCFC–141b in some foam end uses and unacceptable in others. EPA found that those two chemicals were acceptable substitutes for HCFC–141b in foam insulation used in commercial refrigeration, sandwichpanel insulation, polyurethane slabstock, and other foams, assuming users intending to use the substitutes ascertain and document that other acceptable alternatives are not "technically feasible." Protection of Stratospheric Ozone, 67 Fed. Reg. 47,703, 47,711 (July 22, 2002).

EPA justified this conclusion by noting that use of these two substitutes in these end uses was widespread (because they are similar in cost to HCFC–141b), and that there were diverse commercial applications for such foams, each of which had unique "technical considerations." *Id.* at 47,713. Those diverse specifications, EPA reasoned, might make it difficult for businesses to switch to other, non-ozone-depleting blowing agents. For example, in foam used to insulate refrigerated truck bodies and insulated rail cars, "it is critical to maintain thermal performance, flammability control, and an absolute outside dimension of a container while maximizing internal dimensions," and non-ozone-depleting chemicals might not be sufficient to meet these requirements. *Id.* Also, because businesses use all three kinds of chemicals, and because of the diverse commercial applications for these foams, EPA believed it had insufficient information to assess the "viability" of alternatives in each application. *Id.* at 47,714. In some "niche applications . . . foam manufacturers may experience difficulties and delays in transitioning to . . . alternatives. Given the constraints associated with cost and timing

of transitioning to alternatives for small businesses, and the need to facilitate a smooth and equitable transition," *id.*, EPA believed that the limited use of these substitutes was appropriate if applicants made the required showing of technical infeasibility.

## II.

The first issue we must decide is whether this justification for approving new uses of HCFC–22 and HCFC–142b as acceptable substitutes for HCFC–141b relied on economic factors.[1]  EPA's defense to Honeywell's challenge is not that CAA section 612(c) allows it to consider economic costs in deciding whether a given substitute is acceptable or unacceptable.  Rather, EPA's defense is that the rule under review did not actually consider costs, and instead relied on "technical constraints."

The flaw in EPA's position is the assumption that technical constraints exclude considerations of economics.  In truth, economic feasibility is part of technical feasibility.  It is often possible to fit a round peg in a square hole if enough money is spent to make the round peg fit.  In other words, a given change in manufacturing technique may be "technically infeasible" only as compared to some baseline of what it would cost to change the technique.

The rule confirms that the technical considerations considered by the agency intersect with economic considerations.  For example, the need for refrigerated truck bodies and insulated rail cars to "maximiz[e] internal dimensions," *id.* at 47,713, arises because trucking companies want to transport as much food as possible per truckload to maximize their revenues.  Similarly, EPA suggested that the "technical constraints," associated with switching to non-ozone-depleting chemicals were company-specific, in part because the economic need for businesses to "remain cost competitive" caused

---

[1]    As this statement of the issue makes clear, we in fact disagree with the dissent that this merits question "depends . . . on what it means for 'technical constraints' to 'preclude' the use of other available substitutes."  Dissent at 1.

widespread use of HCFC–22 and HCFC–142b. *Id.* The implication is that economic factors caused those companies to be "locked in" to using these particular chemicals in the manufacturing process, despite the fact that within those end uses, "non-ozone depleting alternatives have been identified and, in limited cases, implemented successfully." *Id.* In other words, even though it is technically possible to use manufacturing techniques that do not deplete the ozone layer, it would cost too much to require companies to transition to such techniques given those that, for cost reasons, they have already implemented. This, too, is therefore an economic justification for continuing to allow these companies to use HCFC–22 and HCFC–142b. Finally, EPA noted that the wide variety of products these types of foam are used to manufacture meant that small businesses might economically suffer from a regulatory requirement to use non-ozone-depleting alternatives. EPA noted, specifically, that it was necessary to "level the playing field for small businesses," and that those businesses might face "constraints associated with cost and timing of transitioning to alternatives," a justification that clearly considers costs. *Id.* at 47,714. Even if the agency is correct to characterize such concerns as "performance" or "technical" factors, the fact remains that they are also economic factors.

EPA's reliance on economic constraints requires reversal of its rule. As stated, EPA does not justify the rule on the ground that CAA section 612(c) allows it to consider economic factors in approving a given substitute as acceptable or unacceptable. Nevertheless, EPA's counsel at oral argument said that EPA's position is that it may consider costs, and it is at least facially plausible to read the term "available" in section 612(c) to permit consideration of "economic or practicality" concerns. Such a justification cannot pass muster in this Court, however, as the agency did not offer that construction of the statute below. Under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), whether the CAA section 612(c), a statute EPA is charged to administer, permits EPA to consider costs is a matter on which we defer to the agency's expert judgment,

unless its interpretation is unreasonable or if the plain terms of the statute say otherwise. *Id.* at 843–44. In such matters, in which the agency's rule "is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment." *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943). Whether the agency's construction of the statute is reasonable under *Chevron* step two is one such issue, given that the issue requires agency expertise. *See Kansas City v. HUD*, 923 F.2d 188, 192 (D.C. Cir. 1991). Therefore, even assuming, without deciding, that the text of section 612(c) permits EPA to interpret the statute to consider costs, we must still reverse EPA's decision and remand to the agency. Without knowing the agency's interpretation of the statute, we simply have no way of evaluating whether its interpretation is reasonable. True, we do not defer to the EPA on whether section 612(c) *clearly requires* it to consider costs, but EPA has not advanced that argument before us. Because that argument has not been briefed and is therefore not properly before us, we express no opinion on its merits.

For these reasons, we grant the petition for review.

### III.

The second issue we must decide is the proper remedy to correct the agency's error. We hold that remedy is to vacate the rule to the extent it approves ATOFINA's application to list new uses of HCFC–22 and HCFC–142b as acceptable substitutes for HCFC–141b in certain limited end uses.

We read the judicial review provisions of the CAA to authorize us only to vacate, rather than remand, for the sort of challenge at issue here. Honeywell's challenge is a substantive challenge to the agency's statutory authority to promulgate the rule. Such challenges are governed by CAA section 307(d)(9), rather than the Administrative Procedure Act. *See* 42 U.S.C. § 7607(d)(1) ("[t]he provisions of section 553 through 557 and section 706 of Title 5 shall not, except as

expressly provided in this subsection, apply to actions to which this subsection applies").

Section 307(d)(9) provides that "the court may *reverse* any . . . action found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 42 U.S.C. § 7607(d)(9)(C) (emphasis added). Here, the term "reverse" is being used as a term of art to refer to the action of a reviewing court that finds error in a decision under review. In that context, the ordinary meaning of the term "reverse," at the time section 307(d) was enacted as part of the CAA Amendments of 1977, 91 Stat. 685, 775, was "to overthrow, set aside, or make void (a legal decision) by a contrary decision." Webster's New Collegiate Dictionary 991 (1973); *see also* Webster's Third New International Dictionary 1943 (1981) ("to overthrow [a legal decision] by a contrary decision: make void [as for error] <the higher court may [reverse] the judgment>"). "Overthrow[ing], set[ting] aside, or mak[ing] void" is language suggesting vacatur. Because this Court's only source of authority to order a remedy for EPA's unlawful action is section 307(d)(9), our power is limited to "reversing," and hence vacating, the offending portions of EPA's rule below.

We do realize that there is circuit "precedent for the authority of the court to remand without vacating." *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 758 (D.C. Cir. 2002) (Sentelle, J., dissenting); *see also id.* at 755–56 (majority opinion) (citing cases). To our knowledge, however, our only case under the CAA holding that remand, rather than vacatur, is the proper remedy is *Davis County Solid Waste Management v. EPA*, 108 F.3d 1454 (D.C. Cir. 1997) (per curiam), which we do not think governs our holding here. In *Davis*, this Court held that EPA exceeded its statutory authority under the CAA, yet remanded without vacating the rule. *Id.* at 1459. However, in *Davis* we did not analyze the actual language of section 307(d)(9), and it does not appear that the parties brought that language to the court's attention. That decision is therefore not binding on this Court. For "[t]he Supreme Court held long ago that '[q]uestions which merely lurk in the record, neither brought to the

attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.'" *Checkosky v. SEC*, 23 F.3d 452, 492 (D.C. Cir. 1994) (per curiam) (separate opinion of Randolph, J.) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)); *see also In re Cheney*, 334 F.3d 1096, 1118 n.8 (D.C. Cir. 2003) (Randolph, J., dissenting), vacated on other grounds by *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, No. 03–475, slip op. at 16 (June 24, 2004). We do not read court cases like we read statutes; unlike statutes, cases derive their binding force from the necessity to avoid revisiting arguments and issues litigated before and decided by those courts, not from the deductive implications of their holdings. The currency of courts is principle, not commands, and we violate no principle laid down by *Davis* by analyzing the actual words of the statute setting forth the extent of this Court's remedial power over the EPA's CAA rules. In light of *Davis*'s silence on the interpretation of the term "reverse" in section 307(d)(9), *Davis* is not binding on that question.

In sum, vacatur, rather than remand, is the only remedy we are authorized to impose to correct the error in the rule under review.

## IV.

For the reasons expressed above, we vacate the rule with respect to those end uses in which EPA permitted limited new use of HCFC–22 and HCFC–142b as acceptable substitutes for HCFC–141b and remand to the EPA for proceedings not inconsistent with this opinion.

1

RANDOLPH, *Circuit Judge*, concurring, with whom SENTELLE, *Circuit Judge*, joins: I join the per curiam opinion and Judge Sentelle's opinion in part II. I write separately to explain why I believe vacating (or reversing) and remanding unlawful agency action, rather than simply remanding, should always be the preferred course.

It is easy to forget that when we vacate and remand, as we are doing here, there will be a safety valve. The agency, and any intervenors on its side, will have the opportunity to file post-decision motions demonstrating why the unlawful order or rule should remain in place during proceedings on remand. *See, e.g., U.S. Tel. Ass'n v. FCC*, 188 F.3d 521, 531 (D.C. Cir. 1999). Vacating an order or rule and then entertaining such stay motions has several important advantages over remanding without vacating. First, it preserves the adversary process. When we simply order a remand at the end of our merits opinion we are invariably making a remedial decision without the benefit of briefing or argument. It is quite rare for the parties even to mention the question of remedy in their merits briefs. In post-decision motions on stay applications, that will be the question they address. The court thus will have the benefit of hearing from both sides. Second, in deciding whether to allow unlawful agency action to remain in place during the remand (by way of a stay), the court will act with its eyes open and will have the information needed to assess the consequences of granting or denying a stay. Third, the existence of a stay with time limits, rather than an open-ended remand without vacatur, will give the agency an incentive to act promptly; when we simply remand, the agency has no such incentive. Fourth, there is a long-standing body of law in this circuit establishing the factors that determine whether a stay should be granted. *See, e.g.,Virginia Petroleum Jobbers v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958); *WMATA v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977); *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 673–74 (D.C. Cir. 1985) (per curiam). These include the likelihood that the agency's position will prevail on remand; the likelihood that there will be irreparable harm without the stay; the prospect that others will be harmed if the court grants the stay; and the public interest in granting the stay. *Id.* Remanding without vacating is in effect grant-

ing an indefinite stay of the effectiveness of the court's decision. Yet we have issued many remand-only orders without mentioning or analyzing any of the considerations that should guide our remedial judgment. *See, e.g., Western Resources, Inc. v. FERC*, 9 F.3d 1568, 1581 (D.C. Cir. 1993); *Laclede Gas Co. v. FERC*, 997 F.2d 936, 948 (D.C. Cir. 1993); *City of Mesa v. FERC*, 993 F.2d 888, 898 (D.C. Cir. 1993). Even when we have offered some reasons for remanding without vacating, the reasons given are different from the factors set forth in *Virginia Petroleum Jobbers*, which I believe should be controlling. *See, e.g., Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002). I would therefore vacate and remand regardless whether a judicial review provision gave us discretion merely to remand and leave the illegal rule in place.

ROGERS, *Circuit Judge*, concurring in part and dissenting in part: I concur in holding that EPA impermissibly considered costs in the rule on review. *See* Op. Part II. I write separately in Part I on the nature of the error, because I cannot join the court's reasoning, and in Part II on the appropriate remedy, because the court has ignored binding precedent. Thereafter, in light of the required remand, I address in Part III Honeywell's contention that EPA's past approval of other substitute chemicals as safe alternatives preclude it from making any exceptions authorizing use of HCFC–22 or HCFC–142b for some foam end users.

## I.

The challenged regulation permits new use of HCFC–22 and HCFC–142b only when "necessary to meet performance or safety requirements," and "technical constraints [ ] preclude the use of other available substitutes." 40 C.F.R. Pt. 82 Subpt. G, app. K (2004). Whether EPA impermissibly took costs into consideration depends on what it means for "technical constraints" to "preclude" the use of other available substitutes. While there is language in the rule indicating that EPA considered costs, the more natural reading of the regulation, in light of the language EPA used, is, as EPA counsel maintains, that the regulation means what it says it means: an end-user may only use HCFC–22 or HCFC–142b if it is not actually possible to use anything else. The fact that it might be more expensive to use an approved alternative would not suffice — use of the hydrochlorofluorocarbon must be "necessary."

This reading of the regulation is certainly natural, as it gives the term "preclude" its most obvious meaning of "to make impossible." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 212 (4th ed. 2000). Indeed, absent EPA's reference in the final rule to costs, the court would likely read the regulation as EPA's counsel suggests, giving the word "preclude" its most natural, dictionary meaning. *Cf. Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 202–02 (D.C. Cir. 1991). If technical constraints must "make impossible" the use of an approved substitute before use of a hydrochlorofluorocarbon is permitted, then the court's concern about

EPA permitting HCFC–22 or HCFC–142b use on the basis of mere convenience or cost, *see* Op. at 15–16, would be inapposite: modifications might be required to shift to an approved substitute that "make difficult" or "make costly" or "make inconvenient" the use of an approved substitute, but they would not "preclude" it. Notably, the record before the court indicates that the transition from HCFC–141b to HCFC–22 or HCFC–142b is more likely to involve equipment modifications than the transition from HCFC–141b to an approved alternative. HFC–245fa, Honeywell's product, is a liquid agent like HCFC–141b, and was developed specifically as a "drop-in" substitute for use in the same equipment. HCFC–22 and HCFC–142b, on the other hand, are both gaseous agents, which, EPA acknowledged, would often require modifications to equipment currently using liquid agents such as HCFC–141b. *See* 67 Fed. Reg. 47,703, 47,713–14 (July 22, 2002). Some transition costs, then, would cut against HCFC–22 and HCFC–142b rather than in their favor. Thus, EPA counsel's suggestion, that the HCFCs' use under the new regulation is intended for cases where foam made with an approved substitute would not be functional, is not without plausibility.

Under a natural reading of the language used by EPA, HCFC–22 and HCFC–142b use would be reserved, not for situations where it would be "possible to fit a round peg in a square hole" with sufficient expense, Op. at 15, but for situations where the physical limitations of approved foam-blowing (or foam-pouring) agents are such that equipment or design modifications will not be sufficient to meet "performance or safety requirements." With this view of EPA's meaning, the fact that EPA also referred to costs in explaining the regulation would be harmless error. *Cf. PDK Laboratories Inc. v. EPA*, 362 F.3d 786, 799 (D.C. Cir. 2004); 5 U.S.C. § 706. The bulk of EPA's explanation of the regulation in the final rule is consistent with this natural reading of the regulation. EPA relied chiefly on its concern that foam made with existing alternatives might, in some instances, not meet certain dimensional, flammability control, and insulation requirements. *See* 67 Fed. Reg. at 47,713–14. EPA did not conclude that approved alternatives would produce less desir-

able foam; rather, it expressed concern that it did not yet have enough information to confirm whether the foam made with existing approved substitutes to HCFC–141b would always work functionally as well as foam made with HCFC–22 or HCFC–142b.

The court appears to hold that EPA impermissibly considered costs at two stages of its decision: first, by comparing the functionality of foam made with approved alternatives with foam made with HCFC–22 and HCFC–142b, and second, by considering the costs manufacturers would incur in switching to approved alternatives. *See* Op. at 15–16. While EPA relied on the first consideration, it was not error to do so. The court defines too broadly what it means for EPA to impermissibly consider costs. Expressing concern over whether a substitute product actually works (or works as well) as the substance it is replacing is, of course, a decision that may carry economic consequences, as where a less functional foam product will be less commercially desirable. If a foam is denser, picnic coolers will have to be heavier to keep the same amount of food cold; if a foam is less insular, it will require thicker walls in refrigerators or houses that use it as insulation. But that does not convert every decision EPA makes about whether a substitute works into a decision about costs: were that so, every approval or disapproval decision EPA makes under the SNAP program would be suspect, an extreme position Honeywell does not urge.

The court's second theory, however — that EPA based its decision in part on the costs manufacturers would incur in switching to approved alternatives — is indicated by the record. *See* Op. at 15–16. A statement by EPA in the rule, about protecting small businesses, calls into question the natural reading of the regulation urged by EPA counsel:

> In other cases, where HCFC–141b is used in niche applications, EPA believes foam manufacturers may experience difficulties and delays in transitioning from HCFC–141b to non-ozone-depleting alternatives. Given the constraints associated with *cost* and timing of transitioning to alternatives for small businesses, and the need to facilitate a smooth and equitable transition from

> HCC–141b, EPA believes . . . it is appropriate to ap-
> prove use of HCFC–22 and/or HCFC–142b as substitutes
> for HCFC–141b . . . provided that the users . . . ascer-
> tain and document that other acceptable alternatives are
> not technically feasible.

67 Fed. Reg. at 47,714 (emphasis added). It is difficult to understand this passage unless EPA believes there is some subset of end-users for whom it would be possible yet very costly to switch to non-ozone-depleting alternatives, and that the rule grants this subset some form of relief. This, in turn, suggests that EPA construes the term "preclude" to mean something less than "make impossible," such as to "make difficult" or "make cumbersome."[1] If so, EPA's approach would appear inconsistent with its current SNAP regulations.

Section 612(c) directs the Administrator of EPA to make the use of environmentally harmful substitutes unlawful if, *inter alia*, alternatives presenting reduced harm are "current-ly or potentially available"; the regulations provide that a substitute will be deemed "unacceptable" if "other alterna-tives *exist* that reduce overall risk." 40 C.F.R. § 82.180(b)(4) (emphasis added). The court, in dicta, opines that a substi-tute may not be "currently or potentially available" within the meaning of CAA § 612(c) if using it would be too impractical, *see* Op. at 16, and hence, presumably, does not "exist" for

---

[1] To make the same point, the court also cites EPA's decision to permit *existing* users of HCFC–22 and HCFC–142b to continue their use of those chemicals notwithstanding the existence of non-ozone-depleting alternatives to HCFC–22 and HCFC–142b, in large part because of the costs they would incur were they to use alternatives. *See* Op. at 15–16. EPA quite expressly relied on transition costs in making that decision. However, EPA's decision to allow *continued* use of HCFC–22 and HCFC–142b is not challenged by Honeywell, which petitions for review only of EPA's decision to allow *new* uses of those chemicals, by users previously using HCFC–141b. Given the equipment modifications required to shift from a liquid to a gaseous foam-manufacturing agent, the fact that EPA considered transition costs as a basis for grandfathering *existing* HCFC–22 and HCFC–142b users does not reveal whether such costs played a role in EPA's decision to permit *new* uses.

purposes of § 82.180(b)(4). But the SNAP regulations nowhere attempt to make this link. The definition of "potentially available" turns only on whether EPA "reasonably believes" a substitute "to be technically feasible," *id.* § 82.172, and substitutes must be designated "unacceptable" if cleaner alternatives "exist." *Id.* at § 82.180(b)(4). While the SNAP regulations make the "cost and availability of the substitute" an element of acceptability, *id.* § 82.180(a)(7)(vii), that concern is limited to whether EPA "has . . . reason to prohibit its use," *id.* § 82.180(b)(1), not to whether cleaner alternatives for the substance are already "currently or potentially available." Under the SNAP regulations the fact that it might be difficult or time-consuming for some small businesses or others to use "other alternatives" is irrelevant, so long as those alternatives "exist." Consideration of transition costs is thus precluded by the SNAP regulations as currently written, irrespective of whether it might be permitted under CAA § 612(c), and it is arbitrary and capricious for EPA to fail to comply with its own regulations. *See Dithiocarbamate Task Force v. EPA*, 98 F.3d 1394, 1398–1402 (D.C. Cir. 1996).

For present purposes, as the court states, *see* Op. at [4–5], there is no need to decide whether EPA could, consistent with the text and purpose of CAA § 612, adopt SNAP regulations that incorporate, into a determination of whether a cleaner substitute is "currently or potentially available," consideration of the cost and practicality of transition. While the court speculates that such regulations might pass muster, it properly acknowledges that this question is not before the court. *See* Op. at 17. The SNAP regulations currently include no such provision, and EPA did not attempt, either in the rule or in its brief, to justify relying on costs in the rule on the basis that § 612(c) permits it to do so. It remains to be seen whether EPA will decide to make consideration of transition costs an element of the SNAP process.

Whether CAA § 612(c) would permit substantive consideration of transition costs is not apparent on the face of the statute and presents a serious question of statutory interpretation. Heretofore, when Congress has wanted the Administrator to consider costs under the CAA it has expressly called

for consideration of costs or practicality. *See, e.g.,* 42 U.S.C. §§ 7411(a)(1), 7412(d)(2), 7479(2)(C)(3). Title VI's policy of phasing out ozone-depleting substances involves express consideration of the practicality of transition, but at a different point in the process: in deciding whether an accelerated phase-out schedule is warranted, the Administrator is to consider whether "such more stringent schedule is *practicable,* taking into account technological achievability, safety, *and other relevant factors.*" CAA § 606(a)(2), 42 U.S.C. § 7671e (emphasis added). The decision that an accelerated phase-out of HCFC–141b is practicable has already been made. *See* 58 Fed Reg. 65,018, 65,028 (Dec. 10, 1993). The court has repeatedly held in cases involving other sections of the CAA that cost plays no role in the promulgation of emissions standards. *See, e.g., American Lung Assn. v. EPA*, 134 F.3d 388, 389 (D.C. Cir. 1998); *NRDC v. Adm'r, EPA*, 902 F.2d 962, 973 (D.C. Cir. 1990), *vacated in part on other grounds, NRDC v. EPA*, 921 F.2d 326 (D.C. Cir. 1991); *American Petroleum Inst. v. Costle*, 665 F.2d 1176, 1185 (D.C. Cir. 1981); *Lead Indus. Assn., Inc. v. EPA*, 647 F.2d 1130, 1148 (D.C. Cir. 1980). The Supreme Court's decision in *Whitman v. American Trucking Ass'n*, 531 U.S. 457, 467–70 (2001), which rejected a reading of the term "public health" in the CAA that incorporated cost considerations, further cautions against reading economic considerations into the CAA where they do not appear on the face of the statute. Thus, whether CAA § 612(c) might permit consideration of practicality in extreme cases, such, as the court hypothesizes, where it would be so difficult to "fit a round peg in a square hole," Op. at 15, that a non-ozone-depleting alternative could no longer be said to be "available," is a question that is not yet before the court. EPA has not attempted to locate its approach in the statutory text, and it behooves the court, in light of the deference that may be due, to afford EPA the opportunity to decide whether transition costs are to be considered in evaluating a clean alternative's availability.

## II.

While the court properly identifies error in the regulation on review, it goes astray on the appropriate remedy. Under

the court's precedent, the proper remedy in this case is remand, not vacatur. The court explained in *Allied-Signal v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), that remand is preferable to vacatur when an agency might be able to support a rule through further explanation and the "consequences of vacating may be quite disruptive." *Id.* at 151. *See also Sinclair v. FCC*, 284 F.3d 148, 162 (D.C. Cir. 2002); *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1047–49 & 1052–53 (D.C. Cir. 2002). The two *Allied-Signal* factors are both implicated here.

First, the identified defect in the rule that the court has identified may be curable. As discussed, the final regulation permits new use of HCFC–22 and HCFC–142b in certain end-uses when "necessary to meet performance or safety requirements," and "technical constraints [ ] preclude the use of other available substitutes." 40 C.F.R. Pt. 82 Subpt. G, app. K. EPA's counsel suggested a permissible reading of the regulation based on the natural meaning of its terms: that the chemicals may only be used when it is impossible, from a technical standpoint, to use anything else. At the same time, EPA's explanation that it allowed new uses because of "the constraints associated with cost and timing of transitioning to alternatives for small businesses," 67 Fed. Reg. at 47,714, suggests a policy of protecting small businesses from the costs of a possible, yet difficult, transition, and thereby permitting the use of HCFC–22 and HCFC–142b even in some cases where available substitutes already "exist." *Cf.* 40 C.F.R. § 82.180(b)(4). But if EPA intended no more than the natural reading, it can say so on remand, in which event any impermissible reference to costs in the final rule was irrelevant to the regulation actually promulgated, and thus harmless error. *Cf. PDK Laboratories*, 362 F.3d at 799; 5 U.S.C. § 706. Of course, it is possible that EPA may instead decide to promulgate new SNAP regulations permitting consideration of transition costs in determining the availability of alternatives, or it may promulgate a new rule in which cost is not a guiding consideration, based on its existing SNAP regulations. Yet because EPA might wish to retain the rule on review, and might be able to easily cure any

defect, vacating the rule risks unnecessary disruption to the regulatory scheme. *Cf. Allied–Signal*, 988 F.2d at 150–51; *Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454 (D.C. Cir. 1997) (per curiam).

Second, were the court to vacate the final rule with respect to the end-uses in which EPA has permitted limited new HCFC–22 and HCFC–142b use, the result would likely be that all uses of HCFC–22 and HCFC–142b within those end-uses would become permissible, as more than 90 days have elapsed since ATOFINA's petition and the chemicals were not listed as unacceptable in those end-uses prior to the proposed rule. *See* 40 C.F.R. § 82.174(a). This would likely lead to more widespread interim use of these environmentally harmful chemicals than the much more limited use EPA authorized in the rule on review. In the past, where vacatur of a rule risks interim harm to the environment, the court has allowed successfully challenged EPA rules to remain in effect pending remand. *See Davis County Solid Waste Mgmt.*, 280 F.3d at 1459–60. Given the possibility of confusion and environmental harm, the same course of action is warranted here.

Rather than engage the prudential inquiry our case law requires to determine whether remand or vacatur is the proper course of action, the court *sua sponte* holds that there is no statutory authority for the court to remand without vacating. *See* Op. at 17–19. It brushes aside our exhaustive caselaw on this question, much of it quite recent, *see, e.g.*, *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 755–56 (D.C. Cir. 2002); *Fox Television Stations*, 280 F.3d at 1047–49 & 1052–53; *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1023 (D.C. Cir. 1999); *Radio–Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 887–89 (D.C. Cir. 1999); *Allied–Signal*, 988 F.2d at 150–51, by claiming that these cases do not actually constitute precedent and are, in any event, distinguishable. *See* Op. at 18–19. Neither argument is persuasive.

The court rewrites the law of precedent, allowing a later court to avoid binding decisions it prefers not to follow if the earlier decisions did not fully state their reasoning. *See* Op.

at 18–19. But it is long established that irrespective of whether a later court may conclude that its view is the better view, it is bound, absent en banc review, by the court's prior decisions. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc); 28 U.S.C. § 46(c) (2004). It is true that questions that "lurk in the record; neither brought to the attention of the court nor ruled upon" do not constitute precedent. *Webster v. Fall*, 266 U.S. 507, 511 (1925). But the question the court revives today—the court's statutory authority to remand agency action without vacating — has been "brought to the attention of the court" on at least two occasions by separate opinions, and on both occasions, the court remanded the agency action in question without vacating, over separate opinions raising substantially the same arguments as those that make up the holding of the court today. *See Milk Train*, 310 F.3d at 757–58 (Sentelle, J., dissenting); *Checkosky v. SEC*, 23 F.3d 452, 491 (D.C. Cir. 1994) (per curiam) (separate opinion of Randolph, J.).

Nor can the court reasonably distinguish our precedent by pointing out that most of it arose under the Administrative Procedure Act ("APA") rather than the CAA, and that the CAA only grants the court the power to "reverse" administrative actions. 42 U.S.C. § 7607(d)(9)(C) (2004). The court does not explain how the relevant language in the CAA is any different from § 706 of the APA, which confers the power to "set aside" agency action, 5 U.S.C. § 706(2), where the court's opinion itself argues that "set aside" is a synonym for "reverse." Op. at 18 (quoting WEBSTER'S NEW COLLEGIATE DICTIONARY 991 (1973)). And the court's attempt to distinguish *Davis*, where the court, applying the *Allied–Signal* test, remanded a rule under the CAA without vacating, 108 F.3d at 1459–60, by stating that the parties in *Davis* did not raise the question of the court's authority to remand, Op. at 18, ignores that the parties did not raise the issue in the instant case either. Judge Randolph's approach, *see* Concurring Op. at 1–2, may be of interest to the en banc court, but, absent en banc review, our precedent requires that the rule be remanded to EPA for further explanation.

### III.

Finally, in light of the required remand, I address Honeywell's contention that it is entitled to greater relief than the court grants. As discussed, EPA's decision to approve some limited use of HCFC–22 and HCFC–142b was based in large part on its concern that it lacked sufficient information on whether existing "safe alternatives" for HCFC–141b could always function adequately as substitutes. Honeywell contends that this inquiry was foreclosed by EPA's past approval of safe alternatives to HCFC–141b and past refusal to approve ozone-depleting substances as safe alternatives, and that EPA was thus precluded from approving any ozone-depleting substances as substitutes for HCFC–141b, in any end-uses. However, irrespective of whether CAA § 612(c) would permit EPA to approve some limited use of HCFC–22 and HCFC–142b on remand, neither of these other objections present separate obstacles to such approval.

Under CAA § 612(c), the Administrator is required to "publish a list of . . . safe alternatives identified under this subsection," and to promulgate regulations making it unlawful to use any substitute "which the Administrator determines may present adverse effects to human health or the environment, where the Administrator has identified an alternative to such replacement that — (1) reduces the overall risk to human health and the environment; and (2) is currently or potentially available." *Id.* Honeywell maintains that EPA violated this provision because it found that suitable alternatives to HCFC–141b were not "potentially available" even though it had already designated several such substitutes as "safe alternatives." HCFC–22 and HCFC–142b are chemicals that EPA has determined to "present adverse effects to . . . the environment"; the importation and manufacture of both was banned, effective 2010, in the same rule in which EPA imposed the 2003 ban on the importation and manufacture of HCFC–141b. *See* 58 Fed. Reg. at 65,028. EPA therefore cannot permissibly approve their use as substitutes if the Administrator has "identified an alternative" that "(1) reduces the overall risk to human health and the environ-

ment; and (2) is currently or potentially available." CAA § 612(c).

In Honeywell's view, EPA's approval in 1999 of HFC–245fa in "all foam end-uses," 64 Fed. Reg. 68,039, 68,041 (Dec. 6, 1999), as well EPA's approval of other non-ozone-depleting substitutes, *see* 67 Fed. Reg. at 47,711, Table B, encompassed a determination that it is "technically feasible" to use HFC–245fa in all foam end-uses, and that it is therefore "currently or potentially available." This contention conflates two terms in § 612(c): an "alternative . . . that is potentially available" and a "safe alternative[ ] identified under this subsection for specific uses." Being a "safe alternative" and being "currently or potentially available," under EPA's regulations, are not the same thing. The SNAP regulations governing approval of substitutes call only for applicants to identify "applications within each sector end-use in which the substitutes are likely to be used," 40 C.F.R. § 82.178(a)(3), and provide that EPA will approve a substitute where it has "found no reason to prohibit its use," *id.* § 82.180(b)(1), with the decision based on "[a]tmospheric effects," "[g]eneral population risks," "[e]cosystem risks," "[o]ccupational risks," "[c]onsumer risks," "[f]lammability," and "[c]ost and availability." *Id.* § 82.180(a)(7). On the other hand, "potentially available" is defined as "any alternative for which adequate health, safety, and environmental data, as required for the SNAP notification process, exist to make a determination of acceptability, and which the Agency reasonably believes to be technically feasible, even if not all testing has yet been completed and the alternative is not yet produced or sold." *Id.* § 82.172. In other words, being "potentially available" adds the additional element of EPA's reasonable belief in technical feasibility that is not required of substances designated as safe alternatives. A substance can be a "safe alternative" for a particular end-use and yet be "potentially available" for only some, not all, applications within that end-use. EPA was therefore free to decide in this rulemaking proceeding whether specific applications remained in which permissible constraints still prevented the use of existing, non-ozone depleting substitutes such as HFC–245fa, thus rendering them not "potentially available"

for those uses. In light of the remand, it is unnecessary to decide whether EPA had adequate record support for its conclusion that such constraints still existed, but EPA's past approval decisions did not prevent it from evaluating the feasibility of existing alternatives.

Honeywell's related contention that EPA impermissibly deviated from its stated policy of never approving one ozone-depleting substance as a substitute for another fails for essentially the same reason. In prior rules where EPA had expressed this position, such as in its 1999 refusal to list NARM–22, a blend containing HCFC–22, EPA had always qualified it by noting that "[o]ther alternatives . . . are already acceptable that do not contain any ozone-depleting refrigerants." 64 Fed. Reg. 22,982, 22,984 (Apr. 28, 1999). Similarly, in 1993, EPA stated that it "views HCFCs as important interim substitutes that will allow for the earliest possible phaseout of CFCs and other Class I substances" and "believes that the use of HCFCs should be limited to only those applications where other environmentally acceptable alternatives do not exist." 58 Fed. Reg. at 65,026. The informal expressions of EPA policy at recent trade shows, to which Honeywell refers, similarly contain the qualification that EPA is "unlikely" to approve any HCFCs as substitutes for HCFC–141b because, among other things, there are "non-ozone depleters available." All these amount to are a series of situations where EPA found non-ozone-depleting "safe alternatives" to be "available;" in this particular instance EPA determined that the existing "safe alternatives" were not "available" because some specific niche applications remained in which constraints might currently prevent the use of existing, non-ozone depleting substitutes such as HFC–245fa. Whether or not the record supports this conclusion, it was not a departure from any past policy of not approving ozone-depleters.

Honeywell can fare no better with its other contentions, although I do not reach the merits of either. The relief granted by the court eliminates the need to address Honeywell's contention that it did not have adequate notice of EPA final decision. And Honeywell's contention that the final

rule's delegation of technical feasibility determinations to the end-user is contrary to CAA § 612(c)'s requirement that the "Administrator" identify substitutes and to EPA's regulations defining chemicals as "potential available" if "*the Agency reasonably believes them to be technically feasible*," 40 C.F.R. § 82.172 (emphasis added), comes too late. Honeywell waited to make this argument in its Reply Brief, contending that the delegation undermines the narrowed use limitations by creating the risk that end-users will impermissibly consider transition costs as a basis for determining that switching to ozone-friendly alternatives is not technically feasible. *See* Pet. Reply Brief 2, 12. Although such delegation might present a potentially serious issue, *cf. U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 573–74 (D.C. Cir. 2004), the court has "repeatedly held that an argument first made in a reply brief ordinarily comes too late for our consideration" because opposing counsel is denied an opportunity to respond. *See Amgen v. Smith*, 357 F.3d 103, 117–18 (D.C. Cir. 2004) (quoting *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 842 (D.C. Cir. 2001)). Because EPA has had no opportunity to address the delegation issue, and might promulgate a new regulation on remand that does not include the narrowed use limits, its resolution must await another day.